# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
November 4, 2003 Session

### CORWYN E. WINFIELD v. STATE OF TENNESSEE

**Direct Appeal from the Criminal Court for Shelby County**
**No. P 26030    James C. Beasley, Jr., Judge**

---

**No. W2003-00889-CCA-R3-PC  - Filed December 10, 2003**

---

The petitioner appeals the denial of post-conviction relief relating to his conviction for second degree murder.  He argues: (1) the trial court at his original trial improperly instructed the jury regarding the definition of "knowing"; (2) the prosecutor committed misconduct during closing argument at the original trial; and (3) he did not receive the effective assistance of counsel at trial and on appeal.  We affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOE G. RILEY, J., delivered the opinion of the court, in which DAVID H. WELLES and JOHN EVERETT WILLIAMS, JJ., joined.

Edward Witt Chandler, Mountain Home, Arkansas, for the appellant, Corwyn E. Winfield.

Paul G. Summers, Attorney General and Reporter; Kathy D. Aslinger, Assistant Attorney General; William L. Gibbons, District Attorney General; and Paul Hagerman, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

A Shelby County jury convicted the petitioner of second degree murder for shooting his girlfriend as they were driving in his car.  His conviction was affirmed on appeal.  *See* State v. Corwyn E. Winfield, No. W2000-00660-CCA-R3-CD, 2001 Tenn. Crim. App. LEXIS 522 (Tenn. Crim. App. July 11, 2001, at Jackson).  The petitioner subsequently sought post-conviction relief, which was denied.  This appeal followed.

### BACKGROUND

According to our opinion in the direct appeal, the following proof was presented during the petitioner's original trial:

The defendant and the victim, Chijuana Bassett, both in their early twenties at the time of the offense, had been in a romantic, but apparently volatile, relationship

since their high school days at Fairley High School in Memphis and together had a five-year-old daughter. The relationship had lasted some nine years. . . .

. . .

The defendant gave two different explanations of the shooting to investigators. According to the first oral statement, . . . the victim called the defendant at his home on November 25, 1997, and said that she had gotten off work early by giving an excuse about having to pick up their daughter from school because the child was sick. She told the defendant that she wanted to come over to his house. The defendant was cooking something when he heard her drive up and stop in front of his house. When she did not immediately come to the door, he looked outside and saw her slumped over in the car. He went to check on her and realized that she had been shot. The defendant said that he then dragged the victim from her car into his 1993, three-door, green Honda Civic and drove her to the emergency room at Methodist Hospital-South.

After Sergeants Shemwell and Logan had told the defendant of information they had which was inconsistent with this version of the shooting, the defendant then gave a second version. According to the defendant's second version of events, what actually happened was that the victim had paged him from the Circle K on Shelby Drive at approximately 1:30 p.m. When he called her back, she told him she had taken off work early. He told her to come on to the car wash where he was waiting to have his car cleaned. They then drove in her car to a liquor store where he purchased gin. They went back to get his car and then drove to his house where they continued drinking. Subsequently, they left his house in his Honda Civic and were driving east on Shelby Drive when the victim mentioned something about the defendant's handgun. He took the gun out from underneath his seat and the following occurred, according to the defendant:

> She said, "You ain't gonna do nuthin with it so put it up." So, I said, "Whatever." So at that time I had my right arm around her seat and I was stearing [sic] the car with my right knee and I had the gun in my left hand. At that point, I had cocked it. She reached over as I was uncocking the gun and she grabbed my hand and the gun fired.

> When the gun fired, I looked at Chijuana and she was like coughing so I looked down and seen that she had been shot under her left arm near her breast so I drove to Swinnea Road and made a left, then I drove to Winchester and made a left. About Winchester and Airways I called Vonrico from my cellular phone (605-0947) and I told him that I had accidentally shot my girl and I didn't know what to do. So, he told me to take her to the hospital and I told him that's where I was headed and he said that he would meet me there. So I drove down Winchester 'till I got to Graceland and made a left and drove down Graceland past the first

-2-

stop sign and I threw the gun out in a gutter on Graceland by some leaves on the east curb.  I continued down Graceland to Raines Road where I made a right [and] went [down] Faronia where I made a left and drove to Methodist South Emergency Room.

. . .

Thus, the defendant maintained that the shooting was accidental.  Although he chose not to testify, in his statement read to the jury, the defendant denied that he and the victim were fighting or arguing at the time of the shooting.  In fact, the defendant claimed that the two were making plans to marry before Christmas.  The defendant explained the presence of several long scratches on the back of his neck in the following statement, "When I get my hair cut, the back of my neck itches a lot so I scratch it with my nails and I have a rash on both sides of my neck and they itch a lot."

Dr. O'Brian Cleary Smith, Shelby County Medical Examiner, testified concerning the victim's injuries and the cause of death.  He said that the victim was five feet, four inches tall and weighed 218 pounds.  The victim had bruised muscles on the right and left side of the hyoid bone, the bone right underneath the jaw, as well as bleeding behind the esophagus.  Dr. Smith testified that such injuries were consistent with a "blow to the throat or it could be a squeezing type action which would cause the tissues to be crushed underneath."  Dr. Smith also stated that it was possible to damage underlying tissues without damaging the skin.  The choking type injuries to the victim were described by Dr. Smith as "contemporaneous" with the gunshot wound, in that the injuries to the victim's neck could have occurred no more than an hour prior to the gunshot wound.  Dr. Smith testified further that the injuries to the victim's neck could not have been caused by the intubation of the victim during the emergency room resuscitation procedures.

The gunshot wound suffered by the victim was classified by Dr. Smith as a "loose contact gunshot wound" or one where the muzzle of the weapon "would had [sic] been pressed up against the cloth surface and the cloth up against the skin at the time the weapon was fired."  It was a wound that would cause death in about seven to eight minutes without intervention. . . .

. . .

The bullet taken from the victim's body was identified by Tennessee Bureau of Investigation Special Agent Steve Scott as a .22 caliber bullet.  According to the defendant's statement, the victim was shot with a ".22 caliber revolver, 6-shot, black with pistol grip handles," a weapon he claimed to have thrown from his car.  A thorough search by police of the area where the defendant said he threw the weapon was unsuccessful. Officer Robert Martin of the Memphis Police Department testified that on August 19, 1998, some nine months after the shooting, he and his partner

recovered a .22 caliber revolver with pistol grip handles from the trunk of the green Honda Civic owned by the defendant. Special Agent Scott was unable to determine conclusively that the bullet taken from the victim's body had been fired from the weapon retrieved from the defendant's car trunk, but neither was he able to exclude the weapon as the murder weapon. Laboratory results were inconclusive.

*Id.* at \*\*2-11 (footnotes omitted).

## PROOF AT POST-CONVICTION HEARING

At the post-conviction hearing, the petitioner's trial counsel testified that he was prepared for trial, was ready to cross-examine the state's witnesses, and was ready to present the defense theory that the shooting was accidental. Trial counsel indicated his trial strategy was formed based upon all the evidence available to him at the time of trial. He stated he received discovery from the state, met with state witnesses, and investigated the route the petitioner drove to the hospital. He said he met with the petitioner on several occasions prior to trial, and they discussed the state's evidence, potential witnesses, and trial strategy. According to trial counsel, a "character" defense was not viable because of the petitioner's prior inconsistent statements.

Trial counsel testified he did not file a motion seeking evidence of gunpowder on the victim's hands. He explained that while the presence of gunpowder on the victim's hands would have corroborated the petitioner's statement that the victim grabbed the gun, it did not establish that the shooting was accidental. Further, he said that if a test revealed the absence of gunpowder, this would have conflicted with the petitioner's statement and would have been very detrimental. Thus, trial counsel saw no real benefit to a gunpowder residue test.

Trial counsel did not file a pre-trial motion to suppress evidence of the pistol found in the petitioner's car. Trial counsel explained the gun was found when the police arrested the petitioner on unrelated charges a few months before his trial. He testified the general sessions court suppressed the evidence due to an illegal search of the petitioner's vehicle, and the charges were dismissed. At trial, he objected to the admissibility of evidence concerning the weapon, but the trial court overruled his objection. At the post-conviction hearing, he opined the pistol was not "fatal" to the petitioner's case because there was no ballistics match between the pistol and the bullet that killed the victim.

Trial counsel stated he was surprised by the testimony of the medical examiner, Dr. Smith, regarding the injuries to the victim's throat. He indicated he spoke with Dr. Smith prior to trial, but Dr. Smith did not express these views about the injuries to the victim's throat. According to trial counsel, neither the autopsy nor Dr. Smith's written report indicated the victim's throat had been squeezed. He opined it was "out of character" for Dr. Smith to testify to information not found in his written report.

Trial counsel said that as part of his investigation, he also spoke with Dr. McMillan, who testified that he did not believe the intubation during the emergency room procedure caused the injuries. He said he discussed the victim's intubation with Dr. J. Pervis Milnor, a physician who had

experience in trauma medicine, because "based on what I knew that there may be some issue about it." He said Dr. Milnor reviewed the autopsy report and opined the possibility of the intubation causing the throat injuries was "remote."

Trial counsel stated he was also surprised by Dr. Smith's use of the term "loosely applied" regarding the proximity of the weapon to the victim when it was fired.[1] He said he had never heard that term before, but it "clearly conveyed" that the victim's gunshot wound "was not a contact wound." He testified he did not object to Dr. Smith's use of the term because it was not inconsistent with their theory of defense; cross-examination about the meaning of the term might have elicited harmful information; and there was no basis for an objection.

The petitioner presented the affidavit of trauma surgeon Dr. John Otten, who questioned Dr. Smith's conclusions about the injuries to the victim's throat. Dr. Otten opined in the affidavit it was possible to cause such injuries during an emergency intubation. At the hearing, the petitioner stipulated that the affidavit would not be introduced as evidence of the truth of the matters asserted by Dr. Otten.

Trial counsel testified he advised the petitioner of his right to testify, but did not encourage him to testify due to his prior conflicting statements. The attorney stated he did not object to the prosecutor's closing argument that the petitioner went on a "wild ride around Whitehaven" after shooting the victim. He explained he believed her statements were a "reasonable inference from the proof," and raising an objection would call attention to her remarks. He said that the only issue he raised on appeal involved the admissibility of evidence under Tennessee Rule of Evidence 404(b) of the defendant's alleged prior assault of the victim.

The petitioner's father, Tommy Winfield, testified that following Dr. Smith's testimony at trial, the petitioner's brother, a respiratory therapist, advised trial counsel that patients were frequently injured during intubation. Winfield stated trial counsel instructed them that the brother could not testify because he was related to the petitioner. He also said that the petitioner took the most direct route to the hospital following the shooting.

The record established the trial court gave the jury the following instruction on the definition of "knowingly" as it applied to the charged offense of second degree murder:

> "Knowingly" means that a person acts knowingly with respect to the conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist. A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result.

---

[1] At trial, Dr. Smith testified the victim sustained a "loose contact gunshot wound." Trial counsel used the term "loosely applied" when cross-examining Dr. Smith.

## POST-CONVICTION COURT'S FINDINGS

The post-conviction court issued extensive findings and addressed each of the thirty-four grounds for post-conviction relief alleged by the petitioner. In summary, the post-conviction court found: (1) the trial court's instruction defining "knowingly" by using the entire statutory definition was harmless and did not prejudice the petitioner; (2) there was no prosecutorial misconduct; and (3) each of the more than thirty specific allegations of deficiency of trial counsel was unfounded. Accordingly, the post-conviction court denied relief.

## JURY INSTRUCTION

The petitioner first contends he was entitled to post-conviction relief because the trial court failed to properly instruct the jury regarding the definition of "knowingly" as it applied to the *mens rea* element of second degree murder. The state concedes the jury instruction was in error, but contends the failure to raise the issue on direct appeal waives the issue for post-conviction purposes. We agree with the state.

A "knowing killing of another" is second degree murder. Tenn. Code Ann. § 39-13-210(a)(1). The trial court should have instructed the jury that "knowing" refers only to the result of the defendant's conduct, the death of the victim, and erred by including as part of the definition the nature and circumstances surrounding the conduct. *See* State v. Page, 81 S.W.3d 781, 787-88 (Tenn. Crim. App. 2002). Regardless, the error was waived when it was not raised in the direct appeal of the petitioner's conviction. *See* Tenn. Code Ann. § 40-30-106(g). Further, the plain error doctrine has no application in post-conviction relief proceedings. State v. West, 19 S.W.3d 753, 756-57 (Tenn. 2000). Accordingly, the post-conviction court did not err in refusing to grant relief based on the erroneous jury instruction.[2]

## PROSECUTOR'S CLOSING ARGUMENT

Next, the petitioner maintains the post-conviction court erred in denying him relief because the prosecution violated his right to due process during its closing argument at his original trial. More specifically, he contends the state improperly relied upon the proof that he had previously assaulted the victim. This court addressed this issue in the direct appeal of the petitioner's conviction and found the prosecutor's argument was not improper. *See* Corwyn E. Winfield, 2001 Tenn. Crim. App. LEXIS 522, at **23-24. Post-conviction relief is not available for grounds that have been previously determined. Tenn. Code Ann. § 40-30-106(h) (2003). To the extent the petitioner alleges further bases for prosecutorial misconduct during the original trial, those matters are waived for failure to raise them on direct appeal. *Id.* § 40-30-106(g). This issue is without merit.

---

[2]This issue is also discussed subsequently in this opinion as it relates to the petitioner's claim of ineffective assistance of counsel.

# INEFFECTIVE ASSISTANCE OF COUNSEL

Finally, the petitioner argues his trial counsel did not provide him with effective representation. In support of his argument, he cites numerous alleged errors on the part of trial counsel. Based on our thorough review of the record, we conclude the post-conviction court did not err in finding the petitioner failed to establish ineffective assistance of counsel.

## A. Standard of Review

When a claim of ineffective assistance of counsel is made under the Sixth Amendment, the burden is upon the complaining party to show (1) that counsel's performance was deficient, and (2) the deficiency was prejudicial in terms of rendering a reasonable probability that the result of the trial was unreliable or the proceedings fundamentally unfair. *See* Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064, 80 L. Ed. 2d 674 (1984). In Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975), our supreme court required that the services be rendered within the range of competence demanded of attorneys in criminal cases. In reviewing counsel's conduct, we assess performance by eliminating the distorting effects of hindsight and evaluate the conduct from counsel's perspective at the time. Wiggins v. Smith, ___ U.S. ___, ___, 123 S. Ct. 2527, 2536, 156 L. Ed. 2d 471 (2003); Nichols v. State, 90 S.W.3d 576, 587 (Tenn. 2002).

It is unnecessary for a court to address deficiency and prejudice in any particular order, or even to address both if the petitioner makes an insufficient showing on either. Strickland, 466 U.S. at 697, 104 S. Ct. at 2069. In order to establish prejudice, the petitioner must establish a "'reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" State v. Burns, 6 S.W.3d 453, 463 (Tenn. 1999) (quoting Strickland, 466 U.S. at 694, 104 S. Ct. at 2068) (citations omitted).

The petitioner bears the burden of proving the factual allegations that would entitle petitioner to relief by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f) (2003). We review the post-conviction court's factual findings underlying a claim of ineffective assistance of counsel under a *de novo* standard with a presumption that those findings are correct – unless the preponderance of the evidence establishes otherwise. Burns, 6 S.W.3d at 461. However, the post-conviction court's conclusions of law – such as whether counsel's performance was deficient or whether that deficiency was prejudicial – are reviewed under a *de novo* standard with no presumption of correctness. Fields v. State, 40 S.W.3d 450, 457 (Tenn. 2001) (citations omitted).

## B. Tactical Decisions

The petitioner argues trial counsel was ineffective for failing to disclose the incriminating information against the petitioner in his opening statement. Similarly, he contends trial counsel's closing argument was weak; he failed to "zealously argue the differences of the substantive definitions of the crime charged"; he "failed to explain and evaluate the significance of false claims by the prosecutor"; and he failed to argue passionately. The United States Supreme Court has recently addressed a habeas corpus petitioner's claim that his trial attorney was ineffective during closing

argument. *See* <u>Yarborough v. Gentry</u>, ___ U.S. ___, 124 S. Ct. 1, 157 L. Ed. 2d 1 (2003). In that case, the Court stated "[j]udicial review of a defense attorney's summation is . . . highly deferential." *Id.* at ___. The high court noted that although the right to the effective assistance of counsel extends to closing arguments, counsel "has wide latitude in deciding how to best represent a client, and deference to counsel's tactical decisions in his closing presentation is particularly important because of the broad range of legitimate defense strategy at that stage." *Id*. at ___.

We also observe trial counsel's statements to the jury were clearly part of trial counsel's trial strategy, which was to show that the gun was fired accidentally. Deference is made for sound trial strategy if the choices are informed and based upon adequate preparation. *See* <u>Goad v. State</u>, 938 S.W.2d 363, 369 (Tenn. 1996). The record established trial counsel's strategy decisions were informed ones based on adequate preparation. The petitioner has failed to establish trial counsel was deficient.

## C.  Misstating the Law

The petitioner also alleges trial counsel misquoted the applicable law during his closing argument. However, the only citations to the record refer to the <u>prosecution's</u> closing argument that the petitioner was guilty of second degree murder if he killed the victim intentionally. This statement was accurate. *See* Tenn. Code Ann. § 39-11-301(a)(2) (stating the "knowing" *mens rea* is satisfied if the person acts "intentionally"). The petitioner has failed to establish trial counsel's performance was deficient.

## D.  The Pistol

The petitioner contends trial counsel was ineffective in failing to object to the admissibility of the pistol found in his car months after the offense because (1) it was irrelevant, and (2) it was illegally seized. The trial record established trial counsel argued against the admissibility of this evidence contending the state could not establish it was the murder weapon, but the trial court allowed admittance. The petitioner also claims trial counsel erred in failing to appeal the issue. We conclude, after a review of the trial record, that the seized .22 caliber weapon was relevant and properly admitted at trial. In addition, the petitioner did not establish at the post-conviction hearing that the pistol was illegally seized or otherwise subject to suppression. The petitioner has failed to establish trial counsel's performance was deficient or that he suffered prejudice as a result.

## E.  DNA Evidence

The petitioner claims trial counsel failed to obtain DNA evidence to establish his skin or cells were not found underneath the victim's fingernails. However, the pathologist's testimony at trial established the victim's "fingernails were clean." We discern no deficiency. Further, there was no proof at the post-conviction hearing as to what DNA testing would have revealed.

## F.  Impeaching the Officer

The petitioner argues trial counsel failed to properly cross-examine Sergeant Shemwell, who testified at trial regarding the petitioner's prior statements.  He maintains trial counsel should have proven Sergeant Shemwell's testimony was untruthful.  Yet, the petitioner presented no evidence to establish the officer's testimony was false.

## G.  Not Interviewing and Not Using Witnesses

The petitioner alleges trial counsel failed to interview key witnesses and failed to interview and consider defense character witnesses; however, he does not name the potential witnesses he claims trial counsel should have interviewed.  The decision not to present character witnesses was a tactical decision.  Moreover, the only witnesses who testified at the post-conviction hearing were trial counsel and the defendant's father.  "When a petitioner contends that trial counsel failed to discover, interview, or present witnesses in support of his defense, these witnesses should be presented by the petitioner at the evidentiary hearing."  Black v. State, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990); *see also* Scott v. State, 936 S.W.2d 271, 273 (Tenn. Crim. App. 1996).  Accordingly, the petitioner failed to establish trial counsel was ineffective in failing to interview witnesses or present their testimony at trial.

## H.  Failing to Challenge Expert Testimony

The petitioner contends trial counsel should have argued Dr. Smith's expert testimony regarding the victim's throat injuries was not reliable scientific evidence.  *See* Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 589, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993).  Similarly, he claims "loose contact" was not a scientific term.  Our review of the record shows Dr. Smith's testimony regarding the victim's throat injury was based on the autopsy as well as his interview with the emergency physician who treated the victim.  Further, during his testimony regarding the victim's gunshot wound, he explained what he meant by the term "loose contact wound."  There is nothing in the record indicating Dr. Smith's testimony was inadmissible.  The petitioner has not proven trial counsel was ineffective for failing to object to Dr. Smith's testimony.

## I.  Examination of Dr. Smith

The petitioner also argues trial counsel was ineffective for failing to interview Dr. Smith prior to trial and for failing to properly cross-examine him.   However, the proof at the hearing established trial counsel interviewed Dr. Smith prior to trial and even reviewed Dr. Smith's autopsy report with another physician.  Further, the trial record shows trial counsel extensively cross-examined Dr. Smith.  The petitioner further maintains trial counsel should have cross-examined Dr. Smith regarding his salary and the number of times he had testified for the state.  This type of cross-examination is a matter of trial strategy, and the petitioner may not second-guess a reasonably based trial strategy.  Adkins v. State, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994); Cooper v. State, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992).  This argument lacks merit.

## J.  Failure to Obtain Expert

The petitioner argues trial counsel failed to obtain expert testimony to rebut Dr. Smith's opinion that the victim's throat was injured by squeezing or by a blunt trauma.  The petitioner has failed to establish that he was prejudiced.  He presented Dr. Otten's affidavit indicating the throat injuries could reasonably have been caused by the medical treatment and there was no evidence of choking.  However, he stipulated the affidavit was not submitted to prove the truth of the matters asserted by Dr. Otten.

We fail to see any evidentiary value in the affidavit if it was not submitted for its truth.  Regardless, we are unpersuaded that the petitioner's post-trial discovery of an expert who would disagree with Dr. Smith's opinions somehow translates into ineffective assistance of counsel.  Dr. David McMillan also testified at trial that the medical procedures did not cause any trauma to the neck.  In addition, trial counsel conferred with Dr. J. Pervis Milnor, a physician with experience in trauma medicine, prior to trial.  Dr. Milnor advised trial counsel that the possibility of the medical procedures causing the neck injuries was "remote."  Trial counsel was not deficient in failing to seek other expert assistance with regard to the neck injuries.

## K.  Route to Hospital

The petitioner claims trial counsel failed to challenge the state's theory that the petitioner did not travel a direct route to the hospital following the shooting.  The post-conviction court determined the petitioner's proof at the post-conviction hearing actually established that the petitioner did not take the most direct route to the hospital.  The post-conviction court further concluded the proposed evidence would not have affected the outcome of the trial.  The evidence does not preponderate against these findings of the trial court.

## L.  The Smirk

At trial, a police officer testified he observed the petitioner arrive at the hospital with the victim.  According to the officer, the petitioner had "a smirk type look on his face."  The officer stated the petitioner's expression changed to a "scared look" when he saw him.  In this appeal, the petitioner argues trial counsel was ineffective for not presenting the testimony of a psychological expert to rebut the officer's testimony.  We are simply unable to conclude that trial counsel was deficient for failing to secure expert testimony to explain facial expressions.  Further, the petitioner has failed to establish he was prejudiced by trial counsel's alleged error because he did not present any expert proof on this issue at the post-conviction hearing.

## M.  Failure to Testify

The petitioner argues trial counsel improperly advised him about his right to testify.   He contends he would have made a good witness.  The post-conviction court found, and the trial record reflects, that the petitioner chose not to testify after trial counsel voir-dired him regarding his right to testify.  According to trial counsel, he did not encourage the petitioner to testify due to his prior inconsistent statements.  The petitioner did not testify at the post-conviction hearing.  We cannot

conclude trial counsel was ineffective for not encouraging the petitioner to testify, nor does the evidence preponderate against the post-conviction court's finding that the petitioner decided not to testify after being advised of his rights. The petitioner has failed to establish trial counsel's performance was deficient.

## N. Failure to Object to Closing Argument

The petitioner maintains trial counsel was ineffective for not objecting to the state's closing argument regarding the alleged prior assault. As previously discussed, this court, on direct appeal, found the prosecution's argument was proper. *See* Corwyn E. Winfield, 2001 Tenn. Crim. App. LEXIS 522, at **23-24. This argument is without merit.

## O. The "Knowing" Jury Instruction

Although the petitioner did not specifically raise the issue in his initial brief, he argued in his reply brief and at oral argument that trial counsel was ineffective for not raising the issue of the trial court's erroneous jury charge on the definition of "knowing" on appeal. It is arguable that he has waived the issue. *See* Tenn. R. App. P. 27(a)(7). Regardless, we elect to address it.

The petitioner's case was tried in February 2000. Judgment was entered March 17, 2000. Notice of appeal was filed March 23, 2000. The petitioner's brief was filed December 28, 2000. Oral arguments were heard May 8, 2001. This court entered its judgment and opinion affirming the petitioner's conviction on July 11, 2001.

On July 14, 2000, our state supreme court filed its opinion in State v. Ducker, 27 S.W.3d 889 (Tenn. 2000). In holding that child abuse was not a result-of-conduct offense, the court stated second degree murder was a result-of-conduct offense. Ducker, 27 S.W.3d at 896. However, Ducker did not discuss jury charges.

In the unreported opinion of State v. Keith T. Dupree, W1999-01019-CCA-R3-CD, 2001 Tenn. Crim. App. LEXIS 65 (Tenn. Crim. App. Jan. 30, 2001, at Jackson), this court, facing an issue of first impression, held the trial court erred by failing to charge the jury that the defendant must have acted "knowingly" with regard to the result of his conduct to be found guilty of second degree murder. *Id.* at **11-12.

On April 16, 2002, this court issued its opinion in State v. Page, 81 S.W.3d 781 (Tenn. Crim. App. 2002), in which we held the trial court erred in instructing the jury that the defendant could be convicted of second degree murder if he acted knowingly with respect to his conduct and the circumstances surrounding the offense. *Id.* at 786. In Page, we stated

> [I]t is now established that a knowing second degree murder is strictly a result-of-conduct offense . . . . A jury instruction that allows a jury to convict on second degree

murder based only upon awareness of the nature of the conduct or circumstances surrounding the conduct improperly lessens the state's burden of proof.

*Id.* at 788 (citation omitted).

We begin our analysis of this question by noting that the Page opinion was filed more than nine months after the petitioner's appeal was concluded. Ducker was decided after the trial of this case; thus, defense counsel could only raise this issue on appeal under the plain error doctrine. *See* Tenn. R. App. P. 52(b). While it is arguable appellate counsel could have anticipated our holding in Page based upon Ducker and Dupree, we do not find his performance was deficient for failing to do so. As we observed in Page, Ducker was not a second degree murder case and did not discuss jury charges. *See* Page, 81 S.W.3d at 788. Furthermore, the jury instruction in Dupree was distinguishable from the jury charge in both Page and the instant case. *See id.* In addition, Dupree was decided after the petitioner's brief was filed and shortly before oral argument. Given this chronology of events, we cannot conclude trial counsel's performance was deficient.

## P. Unsupported Allegations

The petitioner contends trial counsel failed to properly investigate or prepare for trial, failed to properly interview the petitioner, failed to obtain exculpatory evidence, failed "to perform his duties," and failed to obtain and analyze the evidence. He claims trial counsel failed to obtain scientific and forensic findings and failed to properly voir dire the jury. Further, he alleges trial counsel failed to object to the misconduct of the prosecutor. These arguments are waived since the defendant has failed to make appropriate references to the record. Tenn. Ct. Crim. App. R. 10(b); State v. Schaller, 975 S.W.2d 313, 318 (Tenn. Crim. App. 1997); *see also* Tenn. R. App. P. 27(a)(7) and (g).

## CONCLUSION

The post-conviction court did not err in denying post-conviction relief. Accordingly, we affirm the judgment of the post-conviction court.

_____
JOE G. RILEY, JUDGE